UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

WILLIAM SLOAN,                                )
                                              )
            Plaintiff,                        )
                                              )
v.                                            )        No.:   3:14-CV-406-TAV-HBG
                                              )
TATE & LYLE INGREDIENTS                       )
AMERICAS  LLC, and                            )
DAVID RENNINGER,                              )
                                              )
            Defendants.                       )

## MEMORANDUM OPINION

This civil action is before the Court on Defendants' Motion for Summary Judgment
[Doc. 67].  Plaintiff responded in opposition [Doc. 71], and defendants replied [Doc. 76].
The Court has carefully considered the matter and, for the reasons stated herein, will grant
defendants' motion as to plaintiff's claims.[1]

## I.      Background[2]

Plaintiff worked as a process technician with defendant Tate & Lyle Ingredients

Americas, LLC ("Tate & Lyle") [Doc. 73 ¶ 1].  Defendant David Renninger was plaintiff's

_____

[1] Plaintiff has filed a Motion to Strike Declaration of Wayne Owsley in Support of
Defendants' Motion for Summary Judgment [Doc. 69].  Defendants responded in opposition
[Doc. 70], and plaintiff replied [Doc. 75].  The Court need not consider this declaration to come
to its conclusion, and the declaration would not alter the Court's conclusion that there is no
genuine issue of material fact that precludes summary judgment in defendant's favor.
Consequently, the Court will deny as moot plaintiff's motion to strike the declaration.

[2] Plaintiff filed a response to defendants' statement of uncontested material facts [Doc.
72].  The Court will consider those facts that plaintiff states are undisputed, and plaintiff's own
statement of undisputed facts [Doc. 73], to provide background to the instant suit.  While the
Court does not cite directly to much of plaintiff's deposition testimony [Docs. 68-2; 68-3] in this
background section, the Court relies on deposition testimony in its analysis.

team coordinator and direct supervisor [*Id.* ¶ 2]. Plaintiff's role at Tate & Lyle began as Alcohol Field Technician and then later became Waste Treatment Technician [Doc. 72 ¶ 4]. Plaintiff's job duties required regular, in-person attendance, and he worked in rotating three-day shifts [*Id.* ¶¶ 4, 12].

Process technicians are required to progress through certain "skill blocks," which include: a basic skill block, an alcohol technician skill block, a waste treatment technician skill block, and a control room skill block [*Id.* ¶ 5]. They are required to complete their skill blocks within eighteen-month time periods, and receive "extensive training" so they are able to work safely [Docs. 72 ¶ 4; 73 ¶ 12].

Plaintiff was granted a continuous eighteen-week leave of absence under the Family Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* ("FMLA") from September 10, 2013, until January 12, 2014 [Doc. 72 ¶ 7]. Plaintiff's FMLA leave expired on December 7, 2013, but he was granted additional leave with short-term disability pay until January 12, 2014 [*Id.*]. Plaintiff's doctor released him to return to work with no restrictions on January 7, 2014, and plaintiff returned to work on January 13, 2014 [*Id.* ¶¶ 8–9]. Plaintiff had completed the alcohol technician and waste treatment technician skill blocks at the time he took FMLA leave [*Id.* ¶ 11]. He commenced the control room skill block prior to taking FMLA leave [*Id.* ¶ 14].

The allegations in this complaint pertain to plaintiff's termination after he returned to work following his FMLA leave, and to plaintiff's emotional distress that he suffered as a

result of his co-worker's conduct both before and after his FMLA leave, which is described herein.[3]

Prior to taking FMLA leave, plaintiff confided in Renninger (plaintiff's coordinator and direct supervisor), Jesse Bryant (an alternate team coordinator), and Wayne Owsley (plaintiff's direct supervisor) that he was "experiencing marital strife," that he suspected his wife of infidelity, and that he suspected she was visiting dating websites and engaging in pornography [Doc. 73 ¶ 18]. In order to investigate whether his wife was soliciting sex or engaging in sexual acts, plaintiff began viewing pornographic websites on his cell phone [Doc. 72 ¶ 20].

Plaintiff also told Edwin Hammann (the alcohol waste treatment area manager) that he was sexually abused as a child, that he was finding pornographic images on his cell phone after leaving work, that he believed his wife was being unfaithful and was engaged in pornography, and that he was fearful for his children's wellbeing [Doc. 73 ¶ 43]. Plaintiff has been diagnosed with post-traumatic stress disorder due to childhood sexual trauma [*Id.* ¶ 15]. He informed Hammann he was going to be taking a leave of absence under the FMLA because he was "on the verge of a nervous breakdown" [*Id.* ¶ 44].

Around this same time, plaintiff states that when he worked with Renninger and Bryant in the control room, Renninger and Bryant would sometimes talk about and look at dating websites on their cell phones [Doc. 72 ¶ 24]. Their conversations were not directed at plaintiff, and did not involve plaintiff's wife [*Id.*]. Plaintiff would sometimes voluntarily

---

[3] The parties do make clear what conduct occurred solely before or solely after plaintiff took FMLA leave. As such, the Court will generally describe the conduct relevant to this motion.

walk over to Renninger and Bryant to look over their shoulders in order to see what they were discussing, but did not look at the screens of their cell phones [*Id.*].

The dating websites that Renninger and Bryant allegedly viewed (which included "Chive," Craigslist, and Ashley Madison) contained images of women who were "half clothed" or "naked" [Docs. 72 ¶ 25; 73 ¶ 19]. These women were not engaged in sex acts, unlike the women on the pornographic websites plaintiff visited on his own cell phone [*Id.*]. While in front of plaintiff, Renninger and Bryant would make lewd and graphic comments about the pictures they viewed on those websites, and also made distasteful comments about a football player's ex-wife [Doc. 73 ¶ 19].

While plaintiff told Renninger and Bryant that he did not want to see the pictures, he did not report their alleged conduct to Tate & Lyle's human resources representatives, and states that the conduct did not interfere with his job [Doc. 72 ¶ 25]. Plaintiff also acknowledges that neither Renninger, Bryant, nor anyone else at Tate & Lyle ever touched plaintiff inappropriately, threatened to physically harm him, or solicited him [*Id.* ¶ 26].

Plaintiff also believed his wife was spying on him through his cell phone, so he often disassembled his phone when he arrived at work [*Id.* ¶ 22]. When he did not disassemble his cell phone at work, he sometimes left it unattended and unlocked [*Id.*]. On occasions when plaintiff would forget to lock his cell phone, he would discover pornography displayed on his cell phone upon leaving work [Doc. 73 ¶ 26]. The images plaintiff found were similar to those plaintiff looked at on his own [Doc. 68-2 (Plaintiff's Deposition, "Pl. Dep.") 216:8–22]. Plaintiff, however, never saw a coworker use his phone [Doc. 72 ¶ 18].

4

At some point, plaintiff overheard Renninger and Bryant discussing "Missy" or "Miss K," which is a nickname for plaintiff's wife [Doc. 73 ¶¶ 27–29]. After hearing this, plaintiff began investigating websites in order to determine whether his wife was engaged in online pornography [*Id.*]. After viewing the pornographic images on his cell phone, and believing that some of the pictures contained his wife, plaintiff began to recall his childhood sexual trauma [Doc. 73 ¶ 34].

When plaintiff returned to work following his FMLA leave, he met with Renninger and Owsley to discuss his job duties, refresher safety training, skill block training, and attendance expectations [Doc. 72 ¶ 9]. At this meeting, Owsley told plaintiff he had "dug himself a pretty good hole" and "had a lot of work to do" [*Id.*]. Renninger later told plaintiff on several occasions that his job was in jeopardy due to the significant amount of time he had been absent from work, and because he was at risk of not completing his control room skill block in a timely fashion [Doc. 73 ¶ 53].

Plaintiff continued to meet with Owsley and Renninger regularly, because plaintiff did not believe his own performance was "up to par" [Doc. 72 ¶ 10].[4] In one such meeting, he again told them he had been sexually abused as a child, believed his wife was having multiple affairs, and believed pornography was being placed on his cell phone [*Id.*]. Owsley encouraged plaintiff to contact Tate & Lyle's Employee Assistance Program.

---

[4] Plaintiff states that the workload that Tate & Lyle imposed on plaintiff when he returned from FMLA leave was "unbearable" [Doc. 73 ¶ 52]. The parties dispute whether Tate & Lyle was going to "toll" the eighteen-month time period for completing his control room skill block to account for his twelve weeks of FMLA leave. The Court finds this is not a material fact, and, in taking all inferences in plaintiff's favor, assumes that Tate & Lyle did not "toll" this time period for the purposes of this motion.

On February 28, 2014, plaintiff texted Renninger stating he was not coming in, but gave no reason for his absence [Doc. 72 ¶ 12]. Plaintiff also did not show up for his next scheduled shift on March 1, 2014, and again texted Renninger that he would not be in that day [*Id.* ¶ 13]. Plaintiff missed his next shift on March 2, 2014, and did not notify anyone that he would not be in [*Id.* ¶ 14].

As a result of plaintiff's three unexcused absences, Owsley sent plaintiff a letter that was delivered on March 6, 2014, prior to plaintiff's next shift that evening [*Id.*]. The letter detailed how plaintiff was being placed on a Personal Improvement Plan because he was a "no call, no show" for three consecutive shifts [*Id.*; Doc. 73 ¶ 79]. This plan prohibited plaintiff from having any unexcused absences for six months, and provided that if plaintiff did not appear for his next scheduled shift, his job would be considered abandoned [Doc. 72 ¶ 14]. Plaintiff states that he did not read this letter until he received it in discovery in the instant suit, but does not dispute its existence [Doc. 73 ¶¶ 79, 80].

Plaintiff did not show up for his next scheduled shift, on March 6, 2014, and did not contact anyone at Tate & Lyle [*Id.* ¶ 15]. On March 7, 2014, plaintiff attempted suicide and was hospitalized until March 10, 2014 [Doc. 73 ¶¶ 62–65]. Plaintiff's wife called Tate & Lyle on March 7, 2014, to inform them that plaintiff was hospitalized [*Id.* ¶ 67]. Plaintiff states that after he voluntarily discharged himself from the hospital, he was "psychologically incapable of speaking with anyone at Tate & Lyle" [*Id.* ¶ 66].

Plaintiff missed his next scheduled shifts on March 8, 12, 13, 14, and 19, 2014, and neither plaintiff nor his wife notified anyone at Tate & Lyle that he would be absent [Doc. 72 ¶ 15]. Despite these absences, plaintiff did not request an accommodation from Tate & Lyle,

and he cannot identify any type of accommodation that would have permitted him to still perform the essential functions of his job [Doc. 72 ¶ 18]. Tate & Lyle sent plaintiff a termination letter on March 29, 2014 [Doc. 73 ¶ 74].

Since being discharged, plaintiff claims he has been totally disabled and unable to perform any work [Doc. 72 ¶ 18]. He does not know when, if ever, he will be able to work, due to his stomach issues, depression, anxiety, post-traumatic stress disorder, and agoraphobia (a fear of leaving one's home) [*Id.*]. Plaintiff's medical providers have not released him to return to work [Doc. 73 ¶ 83].

## II.    Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

Yet, "[o]nce the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a

particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III.     Analysis

Plaintiff filed suit against Tate & Lyle for: (1) disability discrimination under the Americans with Disabilities Act of 2008, 42 U.S.C. § 12101, *et seq.* ("ADA") and the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, *et seq.* ("TDA"); (2) hostile work environment under the ADA and TDA; (3) retaliatory discharge under the FMLA; (4) failure to accommodate under the ADA; and (5) sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq.* ("Title VII"), and the Tennessee Human Rights

Act, Tenn. Code Ann. § 4-31-401, *et seq* ("THRA") [Doc. 20].[5]  Plaintiff filed suit against

Renninger for intentional infliction of emotional distress [Doc. 72 ¶ 27].

### A.    Disability Discrimination under the ADA and TDA

Plaintiff's first claim is that Tate & Lyle discriminated against plaintiff due to his

disability [Doc. 20 p. 15].  The ADA provides that an employer "shall [not] discriminate

against a qualified individual on the basis of disability in regard to job application

procedures, the hiring, advancement, or discharge of employees, employee compensation,

job training, and other terms, conditions, and privileges of employment."  *Whitfield v.

Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011) (quoting 42 U.S.C. § 12112(a)).  The TDA

prohibits private employers from discriminating against employees "based solely upon any

physical, mental or visual disability of the applicant, unless such disability to some degree

prevents the applicant from performing the duties required by the employment sought or

impairs the performance of the work involved."  Tenn. Code Ann. § 8-50-103(b).  "A claim

brought under the THA [Tennessee Handicap Act, now known as TDA] is analyzed under

the same principles as those utilized for the Americans with Disabilities Act."  *Cardenas-

Meade v. Pfizer, Inc.*, No. 12-5043, 2013 WL 49570, at *2 n.2 (6th Cir. Jan. 3, 2013)

(quoting *Sasser v. Quebecor Printing (USA) Corp.*, 159 S.W. 3d 579, 584 (Tenn. Ct. App.

2004)).

---

[5] Plaintiff agrees with defendant that his claims for failure to accommodate under the ADA, and sexual harassment under Title VII and the THRA, should be dismissed [Doc. 74 p. 1 n.1].  Accordingly, defendants' motion as to those claims is granted.

A plaintiff can establish unlawful discrimination under either the ADA or TDA "by introducing direct evidence of discrimination . . . or by introducing indirect evidence of discrimination to shift the burden of production to the employer to articulate a legitimate, nondiscriminatory reason for making the adverse employment decision." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996) (citations omitted), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315–16 (6th Cir. 2012) (en banc). "The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348–49 (6th Cir. 1997).

Where, as here, plaintiff points to no direct evidence of discrimination, courts analyze ADA discrimination claims following the burden shifting approach of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) [*See* Doc. 74 p. 11 (relying on the *McDonnell Douglas* burden-shifting analysis in support of his opposition to the summary judgment motion)]. Under the *McDonnell Douglas* burden-shifting framework, plaintiff must first set out a prima facie case of discrimination. *Williams v. Union Underwear Co.*, 614 F. App'x 249, 253 (6th Cir. 2015). After plaintiff establishes a prima facie case of discrimination, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the employment action. *Id.* at 253–54. If defendant does so, then the burden returns to plaintiff to prove that the stated reason is a pretext for disability discrimination. *Id.*

To make out a prima facie case of employment discrimination under the ADA, a plaintiff must generally show: (1) he is disabled; (2) he was otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment

10

decision; and (4) he suffered such action under circumstances that give rise to an inference of unlawful discrimination. *See Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 364–65 (6th Cir. 2007) (citations omitted). "The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Id.* at 365 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

In the instant dispute, plaintiff submits that he can satisfy his prima facie case because he "successfully performed his job as a process technician . . . until he was harassed and subjected to a hostile work environment to such an extreme that he was constructively discharged" [Doc. 74 p. 18]. Defendants contend that plaintiff was not otherwise qualified for his position, and that he cannot prove that he suffered an adverse employment decision [Docs. 68 p. 13; 76 pp. 5–7]. The Court will first analyze whether plaintiff was constructively discharged, in order to determine whether plaintiff is able to demonstrate an adverse employment action, before turning to the rest of plaintiff's prima facie case.

### 1.     Constructive Discharge

With regard to plaintiff's allegation that he was constructively discharged, plaintiff states that the "intolerable working conditions and hostile work environment" caused plaintiff to be constructively discharged [Doc. 74 p. 18]. Defendants submit that plaintiff is alleging constructive discharge for the first time in his response to defendants' summary judgment motion, and that, in any event, plaintiff cannot meet this heightened burden of proof [Doc. 76 p. 6]. If plaintiff presents sufficient evidence to establish constructive

11

discharge, then he has satisfied the third required prima facie element, namely, that he suffered an adverse employment action. *See Policastro v. Nw. Airlines, Inc.,* 297 F.3d 535, 539 (6th Cir. 2002).

"To demonstrate a constructive discharge, the plaintiff must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; (2) . . . with the intention of forcing the employee to quit; and (3) the employee actually quit." *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 420 (6th Cir. 2015) (citing *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012)); *see also Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2002) (noting that "[a] constructive discharge exists if working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign" (citation and internal quotation marks omitted)). In determining whether the first prong is satisfied, courts should consider several factors, including "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation." *Hurtt*, 627 F. App'x at 420 (citation omitted).

In his response to defendants' summary judgment motion, plaintiff states that Renninger's and Bryant's actions caused him "to go 'insane,' as he felt 'tormented' and 'tortured day in and day out,' and felt like he 'was going through absolute hell' to the point Plaintiff had a mental breakdown and attempted to end his own life" [Doc. 74 p. 19]. The cited portions in plaintiff's deposition testimony, however, do not wholly support the assessment that Renninger's and Bryant's actions were such that they were created an intolerable working condition, prompting plaintiff's resignation and mental breakdown.

In his deposition, plaintiff states that he began receiving treatment for post-traumatic stress disorder after he thought his wife was being unfaithful to him, and he began looking online for images of her on pornographic websites [Pl. Dep. 238:18–21]. Plaintiff described how those images, along with images he saw at work, made him think about the sexual abuse that he suffered as a child [*Id.*]. Plaintiff admits that at the time, he was having a difficult time focusing at work because he believed his wife was cheating on him and possibly appearing on pornographic websites [*Id.* 253:2–12]. Plaintiff told Renninger that he felt like his "whole life was over" and that he had just "lost" his whole family because—in plaintiff's words—"if my wife was doing these things, . . . this was twenty years of my life that I've just wasted" [*Id.* 281:3–282:3].

He states that at work, co-workers looked at dating websites[6] on their cell phones [*Id.* at 239:1–5]. Plaintiff admitted that he knew what his co-workers were allegedly looking at because he would actively look over their shoulders to see what was on their cell phones, although he also states he did not look at their cell phone screens [*Id.* at 239:15–25; Doc. 72 ¶ 24]. The images on these websites, including the ones plaintiff looked at on his own in order to find pictures of his wife, in addition to lewd discussions in which his co-workers engaged, purportedly drove plaintiff "insane" [*Id.* at 240:15].

Plaintiff states the lewd conversations in which his co-workers engaged were not directed toward him, but rather believes they were directed "around" him because they were aware that his "whole life was falling apart" and that he was "losing" his mind [*Id.* at

---

[6] Plaintiff references a few websites, including "Chive," The Country Girl, Craigslist, and Ashley Madison, and describes them as dating websites [Pl. Dep. 240:3–15]. The Court expresses no opinion as to the actual content of the websites.

13

274:14–25; 280:8–12].  Plaintiff admits, however, that there were no suggestions that anyone found his wife on the dating or pornographic websites [*Id.*].  In fact, when plaintiff heard his co-workers reference "Missy" or "Miss K"—an alleged nickname he had for his wife—even though not in the context of a discussion regarding pornography, plaintiff admits that he "jumped to the conclusion that she was doing amateur porn" [*Id.* 279:23–280:5].

When asked if there was any other conduct that he believed constituted sexual harassment against him, plaintiff stated there was not, "[o]ther than the day in and day out bringing up the dating sites," even though he was not a part of those conversations [*Id.* 253:18–254:16; 273:15–274:11].[7]

Drawing all inferences in plaintiff's favor, the record shows that plaintiff's co-workers visited dating websites and looked at pornographic images while at work, and engaged in lewd discussions about the images and posts while doing so.  The record also shows that plaintiff was suffering from his suspicions that his wife was cheating on him and potentially engaging in pornography.  Plaintiff was particularly upset by his co-workers' conduct and statements, as they made him think of his wife.

Even when viewing these facts in the light most favorable to plaintiff, plaintiff has pointed to no evidence from which a reasonable juror could find that Tate & Lyle knowingly permitted conditions of employment so intolerable that any reasonable person subject to such

---

[7] At a later point in his deposition, plaintiff also described an alleged "Adderall incident" in which Mr. Renniger asked plaintiff if he wished to purchase Adderall, and thereafter supposedly continued to make jokes about Adderall and an alleged athlete who was "snorting Adderall" [Pl. Dep. 286:1–287:21].  The Court does not find this conduct created an intolerable working condition, as perceived by a reasonable person.

14

conditions would necessarily resign or stop showing up to work.[8] The Court does not doubt that plaintiff suffered a mental breakdown and that his co-workers' statements and conduct at work were distasteful. Plaintiff admits, however, that the statements were not directed toward him, were not made about his wife, and that he actively walked over to his co-workers to see what they were looking at on their cell phones, despite not looking to the screens of their cell phones. The Court does not find that a reasonable person would perceive this to constitute an "intolerable working condition" that was undertaken with the intention of forcing plaintiff to quit. *Hurtt*, 627 F. App'x at 420.

Accordingly, no reasonable jury could find that plaintiff was constructively discharged, and plaintiff cannot use constructive discharge to establish an adverse employment action in his discrimination and hostile work environment claims under the ADA and TDA. Plaintiff, therefore, cannot satisfy his prima facie case of disability discrimination, and defendant's motion as to this claim is granted.

### 2. Discriminatory Discharge Claim

Even if the Court were to find that plaintiff was constructively discharged—and thus able to show an adverse employment action—the Court finds that plaintiff would still fail to

---

[8] In his statement of undisputed facts, plaintiff submits that he "suffered a complete mental breakdown due to the harassment and retaliation he was experiencing at work" [Doc. 73 ¶ 61]. The portions of his deposition to which he cites for that statement, however, do not support such a strong assertion. He cites to one portion of his deposition in which he stated that he did not remember what he sent via text message to Mr. Owsley when he stopped appearing for work, as he was "in a complete mental break" [Pl. Dep. 159:1–3]. He also cites to his statement that he does not remember what Mr. Renninger responded via text message to plaintiff's notice that he would not be in to work because he was in a "very bad state" due to both his suspicions about his wife's activities and "work as well" [*Id.* at 161:15–21].

15

satisfy his prima facie case of disability discrimination, as plaintiff is unable to demonstrate how he is "qualified" for his position.

To be "qualified" under the ADA, plaintiff must be able to "perform the essential functions" of his job "with or without reasonable accommodation." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) ("*Ford Motor*") (citing 42 U.S.C. § 12111(8)). This "reasonable accommodation" does not include removing an "essential function" from plaintiff's position. *Id.* (citing *Brickers v. Cleveland Bd. of Educ.,* 145 F.3d 846, 850 (6th Cir.1998)).

The elements of a discrimination claim under the TDA are "very similar to those of the ADA, but do not include a 'reasonable accommodation' component." *Bennett v. Nissan N. Am., Inc.*, 315 S.W.3d 832, 841–42 (Tenn. Ct. App. 2009) (citing *Robertson v. Cendant Travel Servs., Inc.*, 252 F. Supp. 2d 573, 583 (M.D. Tenn. 2002)) (stating that the Tennessee Supreme Court requires a plaintiff under the TDA to show he was disabled, qualified for the position, and suffered an adverse employment action); *see also Jones v. Sharp Elecs. Corp.*, No. W2013-01817-COA-R3CV, 2014 WL 806131, at *3 (Tenn. Ct. App. Feb. 28, 2014) ("Unlike its federal counterpart, the Americans with Disabilities Act . . . , the TDA does not impose a duty on employers to make reasonable accommodations to accommodate a disabled employee[.]").

Courts will not find that an employer discriminated against its employee if the employee's disability prevented or impaired him or her from performing the job's duties, as this means the employee was not "qualified" for the position. *Jones v. Sharp Elecs. Corp.*,

16

No. W2013-01817-COA-R3CV, 2014 WL 806131, at *3 (Tenn. Ct. App. Feb. 28, 2014) (citing *Bennett*, 315 S.W.3d at 841).

Caselaw is clear in the Sixth Circuit that expiration of FMLA leave and inability to return to work or to a normal workload are reasons sufficient to warrant termination, as the employee is not otherwise qualified for the position. *See Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 506–07 (6th Cir. 2006) ("[A]n employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave."); *Oliver v. Titlemax*, No. 3:15-cv-190-TAV-CCS, 2016 WL 915186, at *6 (E.D. Tenn. Mar. 4, 2016) (finding plaintiff was not "qualified" under the TDA because she acknowledged she could not perform her "normal workload and conditions" when her FMLA leave expired); *Jones*, 2014 WL 806131, at *4 (upholding the lower court's grant of summary judgment as to plaintiff's discriminatory discharge claim under the TDA, as plaintiff had exhausted all of her leave time available under the FMLA and was still unable to return to work to perform her job duties).

Absenteeism—even due to a disability—is also sufficient to warrant termination, as it prevents an employee from performing essential job functions. *See, e.g.*, *Boileau v. Capital Bank Fin. Corp.*, No. 15-5820, 2016 WL 1622349, at *4 (6th Cir. Apr. 25, 2016) (finding the record supported the district court's conclusion that plaintiff was not qualified for her position "because she could not meet the attendance requirement"); *Ford Motor*, 782 F.3d at 761 ("Much ink has been spilled establishing a general rule that, with few exceptions, an employee who does not come to work cannot perform any of his job functions, essential or otherwise[.]"); *Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 528 (6th Cir. 2015)

17

(holding that "inability to satisfy basic attendance requirements and excessive absenteeism are bases for finding that a particular disabled individual is not a qualified individual with respect to the ADA's framework"); *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418–19 (6th Cir. 2004) (finding that, even if the court does not consider those instances in which the plaintiff specifically informed his employer he would be absent due to his disability, plaintiff was not qualified to perform the essential functions of his job due to his "excessive absenteeism"); *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) ("An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA").

Furthermore, under the ADA, when an employee is absent presumably due to a disability, the burden is on the employee to request an accommodation. *Gantt*, 143 F.3d at 1047. "The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Id.* A "reasonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected." *Id.* (citing *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995)).

Plaintiff admits that attendance was required at Tate & Lyle [Pl. Dep. 74:15–75:6 (stating that his understanding of the company's attendance expectations was that they "were not supposed to miss at all"); *Id.* 130:17–131:4 (stating that he had to physically be at his job, and it could not be done remotely)]. Even when viewing this evidence in the light most favorable to plaintiff, the Court concludes that attendance was an essential function of plaintiff's job at Tate & Lyle.

18

On February 28, 2014, plaintiff sent Renninger and Owsley[9] text messages to tell them he would not be coming in to work.  In his messages, he did not cite to any illness or breakdown, and did not request an accommodation [*Id.* 160:8–161:8].  The next day, March 1, 2014, plaintiff texted Renninger that he would not be in that day either [*Id.* 166:10–20].  Plaintiff also failed to appear at his job on March 2, 2014, and does not recall whether he informed anyone at Tate & Lyle about whether he would be in, and there is no evidence in the record that he did [*Id.* 171:3–14].

Thereafter, Tate & Lyle sent plaintiff a letter informing him that he was being placed on a Personal Improvement Program, and that he could not have any unexcused absences for the next six months [*Id.* 178:1–19].  It also stated that if he failed to appear at his next shift, Tate & Lyle would consider his employment abandoned [*Id.* 178:20–25].  Plaintiff claims he never saw this letter, a fact the Court will presume is true for this motion [*Id.* 175:6–9].

Plaintiff did not appear for his next shift at Tate & Lyle on March 6, 2014, and did not contact anyone to inform them he would not be coming in [*Id.* 180:16–25].  He also missed work on March 7, 2014, and similarly did not contact anyone at Tate & Lyle regarding his absence [*Id.* 181:23–182:3].  Thereafter, plaintiff was admitted to a hospital for four days, missing a scheduled shift on March 8, 2014 [*Id.* 185:11–186:11].  Although plaintiff's wife spoke with Tate & Lyle while plaintiff was in the hospital to inform them he would not be in that day [*Id.* 185:19–21], no one contacted the company after he was out of the hospital [*Id.* 187:18–188:1].  After checking himself out of the hospital on March 10, 2014, plaintiff

_____

[9] While defendant contends plaintiff only texted Renninger, plaintiff claims he also texted Owsley.  Viewing the facts in the light most favorable to plaintiff, the Court will presume plaintiff texted Owsley as well.

missed scheduled shifts on March 12, 13, 14, 18, and 19, 2014, all while never informing

Tate & Lyle that he would be out or requesting an accommodation [*Id.* 188:15–23; 189:16–

24; 190:3–18; 190:22–192:4].

These absences were due to the defendant's disability, which, according to defendant,

is a result of what he believed about his wife's infidelity, the abuse he suffered as a child [*Id.*

209:12–16], how he believed pornographic pictures that looked like his wife were placed on

his phone while at work, how he was worried about what his children were being exposed to,

and how he couldn't keep his mind on his job as a result [*Id.* 210:15–25].

In his deposition, plaintiff admits that he continues to be unable to work due to his

disability, which includes post-traumatic stress disorder, anxiety, "cyclical vomiting, severe

depression," and agoraphobia—which is a "fear of leaving the house" [*Id.* 35:11–17].

Plaintiff's testimony regarding his current inability to work is as follows:

> Q. Have you made any effort to seek employment since March 19th of 2014?
> A. No.
> Q. And you have not made any effort to try to locate any employment because you personally believe that you're currently unable to work, correct?
> A. Correct. . . .
> Q. And you don't have any idea when you think you might, if ever, be able to work?
> A. Correct.

[*Id.* 34:1–20].  And later:

> Q. . . . [Y]ou contend that you were completely unable to work since the time that you went into the hospital on or about March 7 of 2014.  Is that accurate?
> A. Yes.
> Q. And you don't believe that you've been able to perform any type of work whatsoever since that time.  Is that accurate?
> A. Correct.
> Q. So not only can you not do your job at Tate & Lyle but you can't do any other jobs anywhere else, right?
> A. Correct.

20

[*Id.* 206:14–207:1].

Upon review, and even when viewing the facts and evidence in the light most favorable to plaintiff, the Court finds that plaintiff is not "qualified" for his position under the TDA or ADA. Even though plaintiff's absences were due to a disability—and even assuming that part of that disability was a result of his stresses regarding work and his fears that co-workers were placing pornographic images on his phone—plaintiff largely did not inform his employer that he was going to be absent from work for multiple shifts, much less seek approval. Plaintiff also admits that, despite using all of his FMLA leave and an additional four weeks of leave granted by Tate & Lyle, he was unable to maintain a normal workload or return to normal work conditions [Pl. Dep. 203:1–25 (describing how he had to make-up his skill blocks for alcohol tech, field tech, and waste treatment as part of his job, and admitting he needed refreshers in all areas for safety reasons)].

Plaintiff also states that he continues to be unable to work, and does not know when— if ever—he would be able to return to work [*Id.* 206:14–207:5]. He submits that he also did not ask for any form of accommodation so he would be able to perform all essential functions of his job [*Id.* 209:1–6]. According to plaintiff, there was nothing Tate & Lyle could have done to permit him to complete all of the essential functions of his job [*Id.* 245:17–21].

As plaintiff was unable perform his normal job duties after his leave expired, and continues to be unable to perform his essential job functions due to his disability, plaintiff is not a "qualified individual" under the ADA or TDA. Accordingly, plaintiff is unable to satisfy a prima facie case, and thus no reasonable jury could find that Tate & Lyle violated

the TDA or ADA by terminating plaintiff for his absenteeism.[10]  Defendants' motion as to plaintiff's disability discrimination claim is granted.

## B. Hostile Work Environment under the ADA and TDA

Plaintiff's next claim is that Tate & Lyle created a hostile work environment [Doc. 20 p. 18].  In order to establish a hostile work environment claim under both the ADA and TDA, plaintiff must demonstrate that: "(1) [he] was disabled; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on [his] disability; (4) the harassment unreasonably interfered with [his] work performance; and (5) the defendant either knew or should have known about the harassment and failed to take corrective measures." *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002); *see also Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 369 n.2 (6th Cir. 2013) (analyzing hostile work environment claims under the TDA and ADA in the same manner).

When looking to the third prong of this inquiry, plaintiff must demonstrate that the harassment was undertaken because of his disability.  *Trepka*, 28 F. App'x at 461 (holding that a plaintiff must demonstrate that the harassing conduct "was motivated by a bias towards the employee's protected class" rather than personal dislike).  For example, in *Bowman v. Shawnee State University*, 220 F.3d 456 (6th Cir. 2000), when analyzing a hostile work environment claim based on the plaintiff's gender, the Sixth Circuit noted that while the plaintiff had recited "a litany of perceived slights and abuses," many of the alleged harassing

---

[10] Even if the Court were to find that plaintiff satisfied his prima facie case, plaintiff has failed to demonstrate how Tate & Lyle's legitimate, non-discriminatory reason for terminating plaintiff was a pretext for discrimination, described *infra* Section III.C.

acts could not be considered in the hostile work environment analysis because they were not "based upon his status" as a male. *Id.* at 464. As a result, even though the plaintiff had been subject to "intimidation, ridicule, and mistreatment," he could not establish a hostile working environment because he failed to demonstrate that this alleged conduct occurred because of his gender. *Id.*

Under the fourth prong of the hostile work environment inquiry, the harassment must be "sufficiently severe or pervasive to alter the conditions of the victim's employment," because "merely offensive" conduct does not satisfy these requirements. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). For example, in *Williams v. General Motors Corp.*, 187 F.3d 553 (6th Cir. 1999), the female plaintiff alleged her supervisor created a hostile work environment because he made sexually explicit, profane, lewd, and offensive comments that were specifically directed at the plaintiff or were about women in general. *Bowman*, 220 F.3d at 464 (citing *Williams*, 187 F.3d at 559). The court concluded that, when looking to the totality of the circumstances, the allegations raised a question of fact for the jury as to whether the plaintiff was subjected to a hostile work environment based on her gender. *Williams*, 187 F.3d at 559.

On the other hand, in *Morris v. Oldham County Fiscal Court*, 201 F.3d 784 (6th Cir. 2000), the Sixth Circuit found that the harassment at issue was not severe enough to create a hostile work environment, as most of the alleged harasser's comments and jokes were not aimed at the plaintiff, and the conduct instead "seems to have consisted of . . . simple teasing, offhand comments, and isolated incidents." *Id.* at 790; *see also Bowman*, 220 F.3d at 464

23

(noting that while there were a few incidents that could "arguably" be considered in a hostile work environment analysis, when compared to the incidents at issue in *Williams*, they were not severe or pervasive enough to satisfy this element).

In the instant dispute, plaintiff alleges that Renninger and Bryant created a hostile work environment due to their harassing plaintiff by allegedly looking at pornography on plaintiff's cell phone and making lewd comments in front of plaintiff about websites they viewed on their own phones [Doc. 74 p. 21]. He submits that such conduct constituted harassment based on plaintiff's post-traumatic stress disorder from his childhood sexual abuse [Doc. 27 ¶ 26]. Defendants state that plaintiff was not subjected to unwelcomed harassment, the alleged harassment was not based on his disability, and it was not severe or pervasive [Doc. 68 pp. 10–21].

Upon review and in viewing the facts in the light most favorable to plaintiff, even if the Court were to assume this conduct occurred, plaintiff has not presented any evidence to demonstrate that this alleged harassment was undertaken "because" of his disability. *Trepka*, 28 F. App'x at 461. Plaintiff has not alleged that any of Renninger and Bryant's comments related to plaintiff's childhood sexual abuse, and plaintiff admits that no one at Tate & Lyle ever touched plaintiff inappropriately or solicited him [Doc. 27 ¶ 26]. Plaintiff has failed to provide evidence of how Renninger and Bryant's lewd comments—which plaintiff admits were not directed at him [Doc. 72 ¶ 24]—were "based on" plaintiff's post-traumatic stress disorder from his childhood abuse, or mental illness[11] resulting from his suspicions about his

---

[11] The Court is not intending to express any opinion as to plaintiff's exact disability, and is merely relying on the facts plaintiff has presented regarding his illness.

24

wife and stress at work. As to plaintiff's allegation that Renninger and Bryant placed pornographic images on plaintiff's cell phone, plaintiff has not shown how they did this because of plaintiff's disability. They may have done this because they personally dislike plaintiff or even wanted to engage in similar conversations with him as they did with each other. As such, plaintiff has presented no evidence to satisfy the third prong of this inquiry.

Even if Renninger and Bryant's actions were undertaken because of plaintiff's disability, the Court finds that plaintiff also cannot satisfy the fourth prong of the hostile work environment inquiry. While Renninger and Bryant's comments about certain websites were inappropriate, unprofessional, inconsiderate, and lewd, they were not sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create a hostile working environment. Plaintiff does not dispute defendants' assertion in their statement of undisputed facts that Renninger and Bryant's discussions were not directed at plaintiff or about plaintiff's wife, and that he would voluntarily look over their shoulders at the images on their cell phones [Doc. 72 ¶ 24; Pl. Dep. 263:12–21]. Plaintiff also does not dispute defendants' statement that Renninger and Bryant's conduct in looking at those images did not interfere with plaintiff's job [*Id.* ¶ 25], and admits that he also viewed similar pornography and images on his cell phone at his house [Pl. Dep. 242:2–8; 263:22–24]. The Court finds, therefore, that plaintiff's co-workers' comments were merely offensive, and do not rise to the level of creating a hostile work environment. Accordingly, the Court finds there is no issue of material of fact as to whether plaintiff was subject to a hostile work environment.

## C.  Retaliatory Discharge under the FMLA

Plaintiff also claims that Tate & Lyle terminated plaintiff in retaliation for taking FMLA leave [Doc. 20 p. 16].  To state a claim of FMLA retaliation under 29 U.S.C. § 2615(a)(2), plaintiff must demonstrate:

> (1) [he] was engaged in an activity protected by the FMLA; (2) the employer knew that [he] was exercising [his] rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to [him]; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Arban v. West Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003)).  Plaintiff bears the burden of demonstrating the causal connection, and must demonstrate that the employer's reasons for terminating him were a pretext for terminating him due to his medical leave.  *Id.*

If plaintiff's claim is based on indirect evidence, the court must apply the *McDonnell Douglas* burden-shifting framework, in which plaintiff must first set out a prima facie case of discrimination.  *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 408–09 (6th Cir. 2014). Plaintiff must simply meet a "low threshold of proof" in order to establish a prima facie case of retaliatory discharge.  *Seeger v. Cincinnati Bell Tel. Co.,*, 681 F.3d 274, 283 (6th Cir. 2012).  If plaintiff satisfies this burden, then the employer must demonstrate a legitimate, nondiscriminatory reason for plaintiff's termination, and then plaintiff must demonstrate that reason is merely a pretext for discrimination.  *Id.*

26

Plaintiff maintains that he has established a causal connection due to the temporal proximity of his return from FMLA leave and his later termination.[12] Where a plaintiff is terminated "very close in time" to when an employer learns of his exercise of a protected activity, the temporal proximity between the dates "is significant enough to constitute evidence of a causal connection[.]" *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *see Judge*, 592 F. App'x at 409 (noting that the Sixth Circuit has found that a temporal proximity of two to three months is sufficient to establishing a causal connection). When "some time" has elapsed between the two dates, however, temporal proximity alone is not sufficient to establish a causal connection. *Mickey*, 516 F.3d at 525. Upon review, the Court agrees that the nearness in time between the expiration of plaintiff's FMLA leave and when plaintiff was terminated—a span of three months' time—is sufficient to meet the low threshold of proof required to demonstrate a causal connection between plaintiff's engaging in a protected activity and termination.

Tate & Lyle submits that its legitimate, nondiscriminatory reason for terminating plaintiff was because plaintiff abandoned his job after being absent from work for ten consecutive shifts [Doc. 76 p. 14]. Plaintiff submits that this is a pretext for discrimination.

"Plaintiffs may show that an employer's proffered reasons for an adverse employment action are pretext for discrimination if the reasons '(1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action.'" *Demyanovich v.*

---

[12] Plaintiff looks to the temporal proximity between his return from leave in January 2014 to his termination in March 2014. Defendants, however, contend that the Court must look to when plaintiff's FMLA leave expired—December, 7, 2013. The Sixth Circuit has stated that it measures temporal proximity from the date FMLA leave expired, and, accordingly, this Court will do the same. *Judge*, 592 F. App'x at 410.

*Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 431 (6th Cir. 2014) (quoting *Seeger*, 681 F.3d at 285). Plaintiff's burden is to demonstrate that defendant's decision was "so unreasonable as to be disbelieved." *Sybrandt v. Home Depot*, 560 F.3d 553, 561 (6th Cir. 2009) (finding no pretext when the employer did not act inconsistently with its prior practice, and had conducted a reasonable investigation prior to terminating the plaintiff).

In the Sixth Circuit, the "honest belief rule" prevents an employee from establishing pretext, "even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless" so long as the employer "honestly believed in the proffered reason given for its employment action[.]" *Banks*, 610 F. App'x at 533 (citing *Smith v. Chrysler Corp.,* 155 F.3d 799, 806 (6th Cir. 1998)). The employer's belief, however, must be "reasonably based on particularized facts rather than on ignorance and mythology." *Id.*

To demonstrate pretext, plaintiff states that when he returned to work after his FMLA leave, Owsley allegedly told him he had dug himself in a hole, and was "in deep shit" due to his being absent [Docs. 73 ¶ 48; 74 p. 16]. Renninger also allegedly told plaintiff that he could lose his job and that "all eyes" were on him [Docs. 73 ¶ 53; 74 p. 16]. In response, Tate & Lyle argues that plaintiff violated the company's attendance policy when he accumulated ten consecutive unexcused absences, and the honest belief rule prevents plaintiff from establishing pretext [Doc. 76 p. 14].

First, when viewing the facts in the light most favorable to plaintiff, the Court finds that plaintiff's termination was based in fact. Plaintiff was terminated three months after the expiration of his FMLA leave, and after plaintiff had missed ten consecutive shifts at work. Plaintiff's deposition testimony makes clear that he did not inform Tate & Lyle of repeated

28

future absences on March 6, 12, 13, 14, 18, and 19 [Pl. Dep. 188:15–23; 189:16–24; 190:3–18; 190:22–192:4], and that he was aware that the Tate & Lyle's attendance policy required him to always be present [Pl. Dep. 74:15–75:6; 130:17–131:4].

Plaintiff also does not dispute defendants' assertion that, after missing four scheduled shifts and receiving his final warning that he could not have any further absences,[13] plaintiff did not go into work or notify Tate & Lyle that he would be absent for a fifth time [Doc. 72 ¶ 28]. After checking himself out of the hospital, plaintiff admits that he continued to miss his next five scheduled shifts, all while never informing Tate & Lyle that he would be out or requesting an accommodation [Pl. Dep. 188:15–23; 189:16–24; 190:3–18; 190:22–192:4]. Plaintiff also admits that he continues to be unable to work, and he does not know when, if ever, he will be able to return to work [*Id.* 206:14–207:5]. These facts support a finding that Tate & Lyle's termination decision was based in fact.

Second, plaintiff's absences appear to have actually motived the decision. On March 3, 2014, Tate & Lyle sent plaintiff a letter after he missed three shifts at work, informing him that he was being placed on a personal improvement plan and could not have any unexcused absences for the next six months [Doc. 68-2, Ex. 14]. The letter also states that if plaintiff failed to appear at his next scheduled shift, Tate & Lyle would conclude he abandoned his job [*Id.*]. Tate & Lyle has also produced the UPS tracking information for this letter, which detailed that it was delivered to plaintiff's house on March 6, 2014 [Doc. 68-2, Ex. 15]. Thereafter, on March 19, 2014, Tate & Lyle sent plaintiff a termination letter that detailed

_____

[13] While plaintiff states he never read this note at the time he received it, he does not dispute the existence of his letter or that Tate & Lyle sent it to him after he had missed multiple shifts at work.

how it had received a phone call from his wife on March 7, 2014, stating he was in the hospital, but had not received any further communication from either of them [Doc. 68-2, Ex. 16]. The letter explains that, despite efforts to contact plaintiff and his wife, his absences and lack of communication caused Tate & Lyle to conclude that plaintiff abandoned his job [*Id.*].

Even assuming plaintiff's allegations are true regarding what Owsley and Renninger told him upon his return from FMLA leave, plaintiff has not presented any evidence to demonstrate how his FMLA leave, his performance at work, or his progress on his skills blocks motivated the termination decision. As such, the Court concludes that plaintiff's repeated absences without notification to Tate & Lyle actually motivated Tate & Lyle's decision to terminate plaintiff.

Finally, plaintiff's repeated absenteeism is a reason sufficient to warrant termination. As stated previously, expiration of FMLA leave and inability to return to work or to a normal workload may warrant termination. *See Edgar*, 443 F.3d at 506–07; *Oliver*, 2016 WL 915186, at *6; *Jones*, 2014 WL 806131, at *4. Absenteeism may also warrant termination. *See Boileau*, 2016 WL 1622349, at *4. Plaintiff admits that attendance is mandatory at Tate & Lyle, that he missed multiple shifts without providing notice, and that he remains unable to work.

Having closely reviewed the record, the Court thus finds plaintiff has not demonstrated how defendant's reason for terminating him was pretext for retaliation.[14]

---

[14] Defendants have also satisfied the honest belief rule. Tate & Lyle relied on reasonably particularized facts when deciding to terminate plaintiff, which included his repeated absences and violation of the Personal Improvement Plan. These particularized facts support Tate & Lyle's honest belief in its proffered reason for terminating plaintiff—that he violated the company's attendance policy and had abandoned his position.

Accordingly, and because the available evidence is insufficient to support an inference of retaliation or to find that defendant's non-discriminatory reason was pretextual, the Court finds that summary judgment on plaintiff's claim of retaliatory discharge is appropriate.

### D. Intentional Infliction of Emotional Distress

Finally, plaintiff alleges a state-law claim that Renninger intentionally caused him to suffer emotional distress [Doc. 20 p. 19]. While the Court has broad discretion under 28 U.S.C. § 1367(c)(3) to dismiss or to retain jurisdiction over pendent state-law claims under the circumstances presented by this case, "the usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment." *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001); *see, e.g., Jackson v. Town of Caryville, Tenn.*, Nos. 3:10-CV-153, 3:10-CV-240, 2011 WL 5143057, at *10 (E.D. Tenn. Oct. 28, 2011). Having found the federal claims should be dismissed on defendant's motion for summary judgment, pursuant to § 1367(c), and in the exercise of its discretion and in the interests of comity, the Court will decline to exercise continuing "pendent" or supplemental jurisdiction over plaintiff claim and defendant's counterclaim. 28 U.S.C. § 1367(c); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725–26 (1966). Accordingly, the Court will dismiss plaintiff's claim for intentional infliction of emotional distress for lack of jurisdiction.

## IV. Conclusion

For the reasons stated herein, the Court will **GRANT** Defendants' Motion for Summary Judgment [Doc. 67] in all respects, and **DENY as MOOT** plaintiff's Motion to Strike Declaration of Wayne Owsley in Support of Defendants' Motion for Summary

Judgment [Doc. 69].  The Court will **DISMISS** all of plaintiff's claims and **DIRECT** the

Clerk of Court to **CLOSE** this case.

 ORDER ACCORDINGLY.


 s/ Thomas A. Varlan_____
 CHIEF UNITED STATES DISTRICT JUDGE